**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **BRIGETTE E. GARRETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-cv-214-GKF-TLW** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Brigitte E. Garrett seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the

evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff previously received supplemental security income benefits for approximately twenty years, allegedly because she suffered post-traumatic stress disorder. (R. 40, 353, 371-79, 407). Her benefits stopped when she went to prison in 2007. (R. 156, 353). Upon her release from prison, plaintiff, then a forty-nine year old female, applied for Title XVI benefits on January 11, 2008, alleging a disability onset date of January 2, 2008. (R. 350-52). Plaintiff alleged that she was unable to work due to depression and anxiety. (R. 408). Plaintiff's claim for benefits was denied initially on April 28, 2008, and on reconsideration on August 4, 2008. (R. 232-22, 234, 235). Following two hearings, the ALJ issued a decision on February 19, 2010, denying benefits and finding plaintiff not disabled. (R. 236-48).

The Appeals Council remanded the case for two reasons: (1) the ALJ found a severe mental impairment at step two but included no limitations in his residual functional capacity findings; and (2) the ALJ incorrectly analyzed the issue of plaintiff's part-time work as substantial gainful activity. (R. 250-52). After conducting a new hearing, the ALJ issued a new decision on July 25, 2011, again denying plaintiff's claim for benefits. (R. 7-29). The Appeals Council denied review, and plaintiff appealed. (R. 1-5).

### The ALJ's Decisions

In his first decision, the ALJ found that plaintiff was performing substantial gainful activity, but he also analyzed plaintiff's case using the five-step process. (R. 236-49). The ALJ

found that plaintiff had severe impairments of diabetes and affective mood disorder. (R. 242). After reviewing plaintiff's medical records and testimony, the ALJ found that plaintiff could perform the full range of sedentary work. Id. As such, the ALJ concluded that plaintiff could do her past relevant work (also her current, part-time work) as a telemarketer and was not disabled. (R. 247-48).

The Appeals Council remanded the case. (R. 250-52). The Appeals Council determined that the ALJ had used the wrong analysis to conclude that plaintiff was currently performing substantial gainful activity. (R. 250-51). The Appeals Council also found that the ALJ erred when he found that plaintiff had a severe mental impairment at step two but no resulting limitations in her residual functional capacity. (R. 250). On remand, the ALJ was to re-consider the question of substantial gainful activity, perform the special technique with respect to plaintiff's mental impairment, re-evaluate plaintiff's residual functional capacity, and re-consider whether plaintiff had any past relevant work. (R. 251). The ALJ was also permitted to retain a vocational expert if necessary. Id.

**Final Decision**

In his second decision, the ALJ found that plaintiff's part-time work as a telemarketer did not qualify as substantial gainful activity because her "actual earnings do not rise to the level of presumed [substantial gainful activity]." (R. 12). Plaintiff had the severe impairments of diabetes and affective mood disorder, but neither impairment, singly or in combination, met or medically equaled a listing. (R. 13). Plaintiff's other alleged impairments of high blood pressure, high cholesterol, and joint inflammation were non-severe. Id. The ALJ also evaluated plaintiff's mental impairment using the "paragraph B" criteria. (R. 13-14). The ALJ found that plaintiff had mild restrictions in activities of daily living; mild difficulties with social functioning; and

moderate difficulties with concentration, persistence, and pace. (R. 13-14). Plaintiff had experienced no episodes of decompensation. (R. 14).

The ALJ then reviewed the medical evidence and testimony from the ALJ hearing. Plaintiff testified that she had received SSID benefits until her incarceration in January 2007. (R. 15). Since February 2008, shortly after her release from prison, she had been working three to four hours a day as a telemarketer. Id. Plaintiff lived alone in a second-floor apartment. Id. She was able to climb the stairs by resting between steps. Id. On a daily basis, plaintiff woke early in the morning, read her Bible, watched television, cleaned her apartment, cooked meals with a friend's help, talked to her mother by telephone, and took the bus to work. (R. 15-16). After work, she read or watched a movie before going to bed. (R. 16). She also visited her son, who was in jail, and attended church regularly. Id. Plaintiff previously attended a drug recovery program at a church, but the program closed. Id. She also was engaged in a custody battle with her daughter's father and was "'going back and forth' to court to obtain visitation" rights. Id. In a function report, plaintiff did complain of issues with sleep, memory, and concentration, in addition to physical limitations. Id. Plaintiff stated that she could only stand for "three to five minutes" and walk two or three blocks at a time. (R. 17).

Plaintiff testified that she received a fifteen minute break at work halfway through her shift but that she sometimes took extra time to "go sit in the bathroom 'because it is quiet.'" (R. 16). Her job required her to call for donations and make additional calls as reminders regarding pledged donations. Id. Plaintiff had no trouble performing the work, did not leave work often, and tried to work the hours set for her. Id. She testified that she had never tried to find a similar full-time position and did not know if she would be able to work full-time. Id.

Plaintiff also testified that she took insulin for diabetes and was able to obtain her medication without a prescription. (R. 16). Plaintiff stated that she had stopped seeing a doctor because she could not afford it, but she also submitted medical records showing that she was continuing to receive care. Id. Plaintiff testified to a number of other medical problems, including numbness in her arms and feet, high blood pressure, high cholesterol, and joint inflammation. Id. Plaintiff was receiving medication for all of her conditions except for joint inflammation. Id.

Plaintiff's medical records showed that plaintiff had uncontrolled diabetes in February 2008. (R. 17). Plaintiff had started treatment with a new clinic in January 2008 and had stated then that she had not gotten good care over the last two years due to her incarceration. Id. Plaintiff had been treating her diabetes with Metformin rather than insulin while she was in prison. Id. Plaintiff reported feeling better after obtaining insulin and other medications, even though she was only partially compliant with taking them. Id. Plaintiff also complained of burning in her feet during this time. (R. 17-18). An examination was normal and plaintiff's doctor attributed those symptoms to plaintiff's statement that she "has to stand 8 hours during work," to age-related arthritic changes, and to plaintiff's weight. (R. 18).

In May 2008, "a resident at OU Family Medicine" filled out a medical source statement opining that plaintiff could lift/carry ten pounds, stand/walk for thirty minutes at a time for less than two hours a workday, and sit up to an hour at a time for less than two hours in a workday. Id. The resident opined that plaintiff "would be unable to perform the work on a continuing and sustained basis (eight hours a day, five days per week) due to the condition of her back and hip." Id. He further opined that plaintiff would miss three or more days of work per month. Id. The

ALJ rejected this opinion because it was based on the resident's uncritical acceptance of plaintiff's subjective complaints rather than objective medical evidence. (R. 18).

In June 2008, plaintiff fell in the shower at home and strained her lumbar and cervical spine. Id. She also injured her knees. Id. Plaintiff's doctor recommended conservative treatment and rest and gave some restrictions on plaintiff's ability to lift and push/pull. (R. 18-19). Plaintiff continued to complain of pain, so doctors ordered an MRI scan in November 2008. (R. 19). The MRI revealed "only minimal degenerative disc disease at L3-L4 and no abnormality . . . that would explain a left lower extremity radiculopathy." Id.

In July 2009, plaintiff reported another fall in the previous month that caused her to experience back pain. Id. She reported continuous pain at a "9 on a scale of 1-10" but stated that exercise and medication relieved her pain. Id. Plaintiff also reported taking Metformin instead of insulin for diabetes because she could not afford insulin. Id. As a result, her blood sugar levels were elevated. Id.

In October 2009, plaintiff attended a follow-up appointment for shoulder pain from her most recent fall and "stated that she was 'now doing great, with no pain.'" Id. X-rays showed "an AC separation," but her doctor determined that she had improved and had no evidence of pain. Id. Her blood sugar levels were still elevated, and her medication was changed. Id.

By June 2010, plaintiff's blood pressure and blood sugar levels were relatively normal. Id. Her doctor determined that her diabetes was "under 'fair control.'" Id. Plaintiff voiced no complaints. Id.

Plaintiff had an additional follow-up visit in March 2011. Id. Her examination was within normal limits, but her blood pressure was elevated. Id. Her doctor determined that plaintiff "should be stabilized on her medications before proceeding with follow-up care for diabetes

mellitus and hypertension." (R. 19). Plaintiff also reported feeling "quite emotional" at that appointment. Id. Plaintiff asked "to see a psychiatric doctor" in April 2011, and the records indicate that her medications for "an anxiety disorder" were adjusted. (R. 20).

The ALJ determined that plaintiff had only received "minimal treatment through Family and Children's Services, a community-based mental health service." Id. Plaintiff had reported feeling depressed because she did not have custody of her daughter. Id. Plaintiff was discharged from treatment in January 2010. Id. The records note plaintiff's improvement and state that she terminated treatment. Id. Plaintiff confirmed that fact at the hearing, stating that she stopped receiving treatment because "it was hard to get there." (R. 16). Based on these facts and plaintiff's three-year employment history, the ALJ concluded that plaintiff had only mild mental limitations in her ability to understand detailed instructions and maintain focus for extended periods of time. (R.20).

In gauging plaintiff's credibility, the ALJ noted that many of plaintiff's physical examinations were "normal." Id. Those notations and "the rather mild objective findings throughout the evidentiary record" were inconsistent with plaintiff's complaints of severe and continuous pain. (R. 20-21). When the ALJ considered the medical evidence and plaintiff's ability to hold a part-time job for three years in combination, he concluded that plaintiff's subjective complaints were "simply not supported by a common-sense, much less 'legal' interpretation of the evidence." (R. 21). The ALJ also noted that plaintiff was no longer receiving medication for joint inflammation and that her other medications were "relatively effective in controlling" plaintiff's symptoms. Id.

The ALJ found further evidence that plaintiff was not credible based on the type of treatment she received. Plaintiff claimed that she could not afford medical or mental health

treatment; however, the ALJ stated that plaintiff was receiving treatment at Family and Children's Services and voluntarily terminated that treatment. (R. 21). The ALJ concluded that plaintiff's reason for terminating treatment – because "it was too hard to get there" – was insufficient. Id. The ALJ reasoned that plaintiff was able to take the bus to work and that Family and Children's Services had a number of locations "spaced throughout the city," making it reasonable to expect plaintiff to be able to attend counseling sessions. Id. Accordingly, the ALJ found that plaintiff must have "no further need of such services." Id.

Finally, the ALJ found plaintiff not credible based upon her part-time work history and her self-reported activities of daily living. (R. 21-22). The ALJ found that plaintiff's activities were "simply inconsistent with the allegations made." (R. 22). Her job as a telemarketer was "semi-skilled" work, requiring plaintiff to be able to concentrate and perform tasks well beyond what she claimed. Id.

The ALJ determined that plaintiff retained the residual functional capacity to perform light work with a mild limitation on her "ability to understand detailed instructions and maintain attention/concentration for extended periods." Id. Plaintiff had no history of past relevant work, as her work as a telemarketer did not qualify as substantial gainful activity. Id. Relying on the testimony of the vocational expert, the ALJ determined that plaintiff could perform light work, such as a food services worker or electrical assembler; or sedentary work, such as an order clerk or circuit board assembler. (R. 23). The ALJ found plaintiff not disabled. (R. 24).

**The Medical Evidence**

Prior to her incarceration, plaintiff sought treatment for depression and anxiety related to the custody battle over her daughter at a local mental health center. (R. 455-556). Between 1999 and 2005, plaintiff received individual therapy and took medication for depression, generalized

anxiety disorder, and kleptomania. (R. 455-556). Plaintiff's attendance was sporadic, and she was discharged in February 2003 after failing to attend appointments for more than three months. (R. 520). Plaintiff went back to treatment to obtain medication in May 2005 and began therapy again in July 2005. (R. 523, 535). Plaintiff was discharged again in September 2005 because she was failing to attend appointments. (R. 518). The discharge notes indicate that plaintiff had made some progress, but she was continuing to shoplift when she became anxious. Id. Her counselor believed that her absences might have been due to incarceration on a revocation of probation. Id.

Plaintiff had also received treatment for diabetes, back pain, and some joint/muscle pain prior to her incarceration. (R. 631-83). Other than her diabetes diagnosis, none of plaintiff's issues appeared to be chronic. Id.

Plaintiff was incarcerated in January 2007. (R. 556-94). Her medical records from the Department of Corrections indicate that plaintiff was given medication for diabetes and hypertension. Id. Although plaintiff was on insulin at the time of her incarceration, the prison prescribed Metformin to control her diabetes. Id. Plaintiff was released from prison in January 2008. (R. 627).

Plaintiff sought treatment for her diabetes at OU Family Clinic shortly after her release from prison. Id. Plaintiff stated that she had not taken any medication for two weeks, but her diabetes had been controlled with Metformin. (R. 627-28). Plaintiff was diagnosed with uncontrolled diabetes and uncontrolled hypertension. Id. Plaintiff sought treatment at the emergency room in early February 2008 due to extremely high blood sugar. (R. 728-46). Plaintiff was given insulin to bring her glucose levels down and was discharged. Id. Thereafter, plaintiff began using insulin to control her diabetes. (R. 603-16).

On February 15, 2008, plaintiff attended a follow-up appointment at OU Family Clinic and complained of blurry vision and pain in her feet from standing for eight hours at work. (R. 603). Plaintiff's diabetic foot examination was normal, so the doctor opined that "most likely the pain was due to prolonged standing along with some arthritic changes because of her age and weight." (R. 605). By April 2008, plaintiff had a "very positive spirit" and was "feeling a lot better." (R. 773). Plaintiff stated that she was compliant with her glucose testing and medications. Id.

In May 2008, plaintiff complained of hip and back pain. (R. 747-71, 777). Plaintiff's x-rays showed "mild hypertrophic changes in the lumbar spine and also lower thoracic spine" but were otherwise normal. (R. 777). Plaintiff's hip x-ray revealed a "slight irregularity of the lateral aspect" of both femoral heads. Id. The radiologist opined that this was a congenital defect. Id. Plaintiff had no signs of arthritic changes. Id. Also in May 2008, an OU Family Clinic resident completed a medical source statement. (R. 839-40). The resident opined that plaintiff could only lift ten pounds, stand/walk for thirty minutes to an hour for less than two hours in an eight-hour workday, and sit for thirty minutes to an hour for less than two hours in an eight-hour work day. (R. 839-40). The resident explained that the "condition of the patient health is for the back and hip it is hard to maintain a lengthy day [sic]." (R. 840). The resident believed that plaintiff would be absent from work three times or more per month and that her impairments had lasted "for years." Id.

Plaintiff also began seeking mental health treatment from Family and Children's Services in July 2008. (R. 822-36, 853-58). Plaintiff was diagnosed with depression NOS (R. 824). Plaintiff reported sadness over the absence of her daughter and anxiety over going to work part-time for the first time in over twenty years. (R. 823-24). Plaintiff attended monthly counseling

sessions from July 2008 through August 2009. (R. 836). The record contains no progress notes on plaintiff's counseling sessions.

Plaintiff fell in the shower in June 2008. (R. 721-27). Plaintiff sought treatment at the emergency room and was diagnosed with a contusion. (R. 727). Plaintiff followed up with the OU Family Clinic, where she complained of shoulder pain. (R. 752-55). The following week, plaintiff sought treatment at a third clinic. (R. 782-85). On examination, the doctor found mild tenderness in the shoulder; muscle spasm in the neck; limited range of motion in the head and neck; mild tenderness in the thoracic spine; marked tenderness at L4-L5 and S1 with muscle spasm and limited range or motion; positive straight leg raise test on the left side; and radiculopathy in the left leg. (R. 784). The doctor diagnosed plaintiff with "[m]arked lumbar spine strain and myofascial irritation, with radicular component in to the sciatic distribution to the left knee;" and "[m]arked cervical spine strain and myofascial irritation, with secondary cephalgia." (R. 785). He recommended physical therapy and other conservative treatments, including chiropractic care and ice/heat therapy at home. Id. The record indicates that plaintiff did receive some chiropractic care, as well as some x-rays in June 2008. (R. 787-800). The x-rays showed "significant" degenerative changes at C4-C5 and C5-C6 with narrowing of the disc space. (R. 783). When plaintiff continued to complain of back pain, her doctor ordered an MRI of the lumbar spine. (R. 786). The scan showed "[m]inimal degenerative disk disease" at L3-4. The doctor saw nothing in the scan "which would explain a left lower extremity radiculopathy." Id.

Plaintiff complained again of shoulder pain in August 2009. (R. 846-52). Plaintiff received an x-ray, which was normal, although the "AC joint on the right side" was slightly

wider than normal, which "may represent separation." (R. 852). There are no further complaints of shoulder pain in the record.

Plaintiff's remaining medical records were submitted post-hearing and indicate that, in June 2010, her diabetes was under "fair control." (R. 864-69). Plaintiff also sought treatment for mental health through a medical clinic in April 2011. (R. 859-63). Plaintiff was diagnosed with anxiety disorder NOS and given a prescription. Id.

**The ALJ Hearings**

The ALJ held three separate hearings in this case, two before the initial decision and a third following the Appeals Council's order remanding the case to the ALJ.

The First Hearing

The ALJ held the first hearing on August 27, 2009. (R. 154-225). Plaintiff testified that she had previously received disability benefits for twenty-one years for post-traumatic stress disorder, depression, and anxiety. (R. 156, 174). She lost her benefits when she was incarcerated for possession of methamphetamine. (R. 156). Plaintiff's attorney stated that she had not used drugs since September 2006 and that, until recently she had attended a recovery program through a local church. (R. 159-60).

After her release from prison in January 2008, plaintiff found part-time work as a telemarketer. (R. 186-87). She worked for a community thrift store that called to solicit items for donation. (R. 186). Plaintiff testified that she had worked since February 2008 and worked four to five hours a day. (R. 186-87). Plaintiff stated that she worked all of the hours that her call center was open but had not looked for a similar job with additional hours. (R. 190). Plaintiff believed that she would not be able to work full-time because she often felt overwhelmed with her part-time work. (R. 205-06). Plaintiff testified that her supervisor helped her handle the

workload, that she often relied on others to drive her to work and back home, that she had difficulty sitting at work, and that she often needed breaks to manage her blood sugar levels. (R. 211-16). Plaintiff also stated that she had briefly worked full-time at a hotel, but her doctor had written a letter stating that she should only work part-time. (R. 194-96). The record, however, did not contain such a letter. Id.

Plaintiff also stated that she believed she was disabled because she struggled to pay for her medication. (R. 206). Plaintiff could not qualify for housing assistance due to her criminal record. (R. 207). Plaintiff had looked into assistance programs but had not found one that would permit her to afford to take all of her medications. (R. 206). As a result, plaintiff testified that her diabetes was not well-controlled. Id. Plaintiff also stated, however, that she was not taking all of her medications. (R. 216).

Additionally, plaintiff stated that she had been seeing a counselor for less than a year to deal with the custody fight over her daughter. (R. 197-99). She was seeing her daughter once a week as part of court-ordered counseling that plaintiff had requested in order to try to reconcile with her child. (R. 199).

The ALJ raised a number of questions about accommodations plaintiff might be receiving because the record indicated that plaintiff was meeting expectations at work without any special accommodation. (R. 207-08). A vocational expert testified that plaintiff's only work experience was her current job, which was sedentary with an SVP of 3. (R. 219). The vocational expert stated that the only limitation she would find, based on plaintiff's testimony, was a sit/stand option. (R. 221). Plaintiff again explained that she believed her supervisor was helping her keep her job. (R. 210-16). The ALJ asked to hear testimony from plaintiff's supervisor, and the hearing adjourned. (R. 224).

Continuation of the Hearing

The ALJ resumed the hearing on November 19, 2009, to hear testimony from plaintiff's supervisor. (R. 109-53). Plaintiff's supervisor had worked for Central Donation Services for two years in a number of positions, but she had only been a supervisor for the call center for three or four months. (R. 112-14). The call center existed to solicit donations of household items from Tulsa County residents. (R. 114). Her job as supervisor was "to make sure that the ladies are sitting in their seats, there's no talking, there's no eating, and they have to stay focused on what they're doing." Id. She first met plaintiff when they worked together as telemarketers in the call center. Id. They were friends and attended church together. (R. 119).

The supervisor testified that telemarketers worked at a desk with a computer and a headset. (R. 115). Telemarketers could stand as needed to stretch their legs, and they took one fifteen minute break during the four-hour work day. Id. Some days, the telemarketers worked five hours, depending on how many calls needed to be made that day. Id. The call center was open from 3:30PM to 8:30PM. (R. 115-16). While the supervisor had additional duties, telemarketers like plaintiff were permitted to clock out and go home once all of the calls had been made. (R. 116).

The supervisor testified that plaintiff was on the verge of being terminated at the time the supervisor took over the call center. (R. 118). Telemarketers were expected to meet a 70-75% quota for successful donation calls, and plaintiff averaged 65-67%. Id. When the supervisor took the position, she was given the option to re-train plaintiff rather than fire her. Id. The supervisor stated that the re-training process was not going very well. (R. 118-19). Plaintiff was still not meeting her quotas, even though the supervisor was assigning "special" calls to plaintiff. (R.

119). The "special" calls were those in which the donor called to ask the Center to pick up donations. Id.

The supervisor also testified that plaintiff was distracted at work. (R. 120). The supervisor stated that plaintiff "gets up, she walks around, she goes to the bathroom. She has to sit in her seat and she's unable to do that, apparently." Id. Plaintiff's constant movement "slows the dialer down," so the supervisor moved plaintiff to a different position in which she made "callbacks." Id. When a telemarketer left, plaintiff was returned to the call center. Id.

The supervisor stated that plaintiff had been reprimanded for failing to meet her quotas. (R. 120-21). The ALJ questioned the supervisor about the manner in which the quotas were calculated, and the supervisor agreed that the quota system was flawed. (R. 121-24). The supervisor testified, however, that plaintiff was also not staying in her seat long enough to make a reasonable number of calls to potential donors. (R. 125). Even if plaintiff's numbers were good, the supervisor stated that plaintiff would still be considered a problem employee because she was not following the rules. (R. 125-26). The supervisor had recently been instructed to cut plaintiff's hours. (R. 132). The supervisor told the ALJ that plaintiff was not performing in a competitive manner. (R. 136). However, the turnover in supervisors was so high that plaintiff never reached the point of termination before a new supervisor was brought in. (R. 136-38). At that point, the new supervisor would opt to re-train plaintiff rather than terminate her, and the process would begin again. (R. 138).

Plaintiff testified that she did not mean to be disruptive, but her back pain required her to get up and move around. (R. 135, 142). Plaintiff also stated that she needed an extra break to take her insulin. (R. 143-44).

<u>Post-Remand Hearing</u>

After the Appeals Council remanded the case to the ALJ for further consideration, the ALJ held a third hearing on June 8, 2011. (R. 32-101). Plaintiff's attorney argued that plaintiff should "grid out" and be found disabled because of her age and the ALJ's initial decision that plaintiff could perform sedentary work. (R. 39-40).

Plaintiff then gave additional testimony about her job and her daily activities. (R. 41-47). Plaintiff continued to work part time in the call center. (R. 43). She lived alone in a second floor apartment and needed to rest while climbing the stairs to her home. (R. 44-45). Plaintiff gave conflicting testimony about her current treatment. (R. 47-51). She initially testified that she had not received treatment in the last year because she could not afford it but then stated that she had received some refills from OU Family Clinic. (R. 51). Plaintiff testified that she was able to obtain insulin without a prescription. (R. 47-48). She had also recently begun seeking treatment from a new community health center. (R. 50). She no longer attended the recovery program at the church because it had closed. (R. 61). She had not found a new program because transportation was an issue. (R. 62).

Plaintiff also testified that she no longer received mental health counseling from Family and Children's Services because she had difficulty getting there, was no longer on the sliding pay scale for services, and had stopped taking the Zoloft prescribed to her. (R. 53). Her new health center, however, had recently renewed her prescription. <u>Id.</u>

Plaintiff stated that she got to work by taking the bus or by asking friends at work for a ride. (R. 54). Plaintiff still had trouble at work. She would take unscheduled breaks to go sit quietly in the bathroom to get away from all the noise, but she tried not to take advantage. (R.

56-58). Plaintiff still believed that she could not work full-time, but she could not articulate a reason for that belief. (R. 57-58).

Plaintiff testified that she could walk only two or three blocks and stand for three to five minutes. (R. 64-65). She also testified, however, that when she took the bus to work, she had to walk fifteen or twenty minutes from the bus stop to the call center. (R. 66). She complained that her feet would occasionally go numb and stay that way for up to two days. (R. 67-69). Her doctor had told her to go to the emergency room if it "gets serious," but she had never sought emergency treatment. (R. 68-69).

A vocational expert testified that plaintiff's current work was sedentary with an SVP of 3. (R. 84). The ALJ asked the vocational expert to consider a hypothetical in which plaintiff could perform light work. (R. 86). The vocational expert testified that there were several light, unskilled jobs plaintiff could perform, such as food service work or light assembly work. (R. 86-87). Plaintiff would also be able to perform unskilled sedentary work, such as an order clerk or circuit board assembly worker. (R. 87). Plaintiff would be able to perform those jobs even with a mild limitation on her ability to understand, remember, and carry out detailed instructions and a mild limitation on her ability to maintain attention and concentration for extended periods of time. Id. If the vocational expert considered the limitations set forth in the OU resident's medical source statement, there were no jobs available. (R. 88).

## ANALYSIS

On appeal, plaintiff raises three issues. First, plaintiff argues that the ALJ erred at step five. (Dkt. # 13). Second, plaintiff argues that the ALJ failed to perform a proper residual functional capacity analysis. Id. Finally, plaintiff argues that the ALJ failed to perform a proper credibility analysis.

### Residual Functional Capacity

Although plaintiff has framed his argument as a step five error, plaintiff is actually arguing that the ALJ erred in assessing her residual functional capacity. Plaintiff contends that the ALJ failed to follow the Appeals Council's order on remand. (Dkt. # 13). Although the ALJ found, at step three, that plaintiff had mild limitations in activities of daily living and social functioning, he did not include those limitations in his hypothetical to the vocational expert. Id. Plaintiff argues that the ALJ also erred in changing the residual functional capacity findings from sedentary work in his first decision to light work in his second decision. Id. The Commissioner argues that plaintiff is confusing the step two analysis of mental impairments with residual functional capacity findings and contends that the ALJ's decision is well-supported by the evidence. (Dkt. # 14). The Commissioner also argues that the ALJ was not bound by his first decision after the Appeals Council remanded the case and that the new residual functional capacity findings are supported by substantial evidence. Id.

Findings regarding the severity of a mental impairment at steps two and three, like those identified in the "paragraph B" criteria do not constitute findings regarding residual functional capacity. See Wells v. Colvin, ___ F.3d ____, 2013 WL 4405723, *5 (10th Cir. August 19, 2013) (quoting SSR 96-8p). Rather, the ALJ must take the findings made at steps two and three and provide a more detailed analysis of the impact of any limitations on a claimant's ability to perform work-related activity. See id. A severe mental impairment must be reflected in the residual functional capacity findings. See Hargis v. Sullivan, 945 F.2d 1482, 1488 (10th Cir. 1991). In addition, the Tenth Circuit has recognized that a limitation "in the 'paragraph B' criteria does not necessarily translate to a work-related functional limitation for the purposes of the [residual functional capacity] assessment." Beasley v. Colvin, 2013 WL 1443761, *5 (10th

Cir. April 10, 2013) (unpublished).[2] Accordingly, if the ALJ's decision not to include limitations for activities of daily living and social functioning in his residual functional capacity findings are supported by substantial evidence, the ALJ did not commit reversible error. See id. at n.3 (declining "to read this court's dicta in a footnote in Frantz v. Astrue, 509 F.3d 1299, 1303 n.3 (10th Cir. 2007), as requiring an ALJ's RFC assessment to mirror his step three-findings.").

In this case, the ALJ addressed both plaintiff's activities of daily living and social functioning in his residual functional capacity assessment. (R. 15-22). Specifically, the ALJ noted that plaintiff lived alone and was able to perform all of her own chores (except cooking, which she did with a friend) and do her own shopping. (R. 15-17, 18, 20-21). Plaintiff took public transportation to work and to visit her son in jail. (R. 21). Plaintiff worked part-time as a telemarketer, communicating with the public, which plaintiff testified was not an issue. Id. She attended church and had, at one time, attended a recovery program at a local church. Id. Plaintiff was also engaged in the court system, testifying that she was working toward obtaining visitation with her daughter. (R. 16). This evidence is sufficient to find that plaintiff's mild limitation in activities of daily living and social functioning and had no work-related limitations to be included in the residual functional capacity assessment. Conversely, the ALJ did find that plaintiff's moderate limitations in concentration, persistence, and pace impacted her ability to work and required a specific limitation. (R. 15, 22). Accordingly, the ALJ properly assessed plaintiff's limitations at both step two and step four and included the findings from step four in his hypothetical to the vocational expert at step five.

Plaintiff also takes issue with the ALJ's finding, in his final decision, that plaintiff could perform light work, as opposed to his first decision, which limited plaintiff to sedentary work.

---

[2] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

(Dkt. # 13). The Commissioner correctly states that the ALJ is not bound to his earlier decision. (Dkt. # 14). See Campbell v. Bowen, 822 F.2d 1518, 1522 (10th Cir. 1987). An ALJ must follow the order of the Appeals Council, but he is also permitted to take "any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977(b), 416.1477(b). To require the ALJ to be bound by his previous findings after remand by the Appeals Council "would discourage administrative law judges from reviewing the record on remand, checking initial findings of fact, and making corrections, if appropriate." Campbell, 822 F.2d at 1522.

The Appeals Council ordered the ALJ to perform the following tasks: (1) "Give further consideration to whether the claimant has engaged in substantial gainful activity since her alleged onset date;" (2) "Further evaluate the claimant's mental impairment," using the special technique; (3) "Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations;" (4) "Give further consideration to whether the claimant has any past relevant work that she is capable of performing;" and (5) obtain testimony from a vocational expert, "[i]f warranted by the expanded record." (R. 249-52). Nothing in the Appeals Council order prevented the ALJ from re-assessing plaintiff's residual functional capacity. In fact, the ALJ was required to do so. The question, then, is whether those findings are supported by substantial evidence.

In his first decision, the ALJ focused almost solely on plaintiff's ability to perform part-time work as a telemarketer. (R. 236-49). Plaintiff's work as a telemarketer qualified as sedentary work; therefore, the ALJ found that plaintiff had the ability to perform sedentary work. Id. In his final decision, however, the ALJ examined plaintiff's abilities in much more detail. (R.

15-22). He focused on plaintiff's activities of daily living, on her current work, and on the objective medical evidence. Id. He concluded that plaintiff could perform light work with a non-exertional limitation. The undersigned finds that the ALJ's decision is supported by substantial evidence because the ALJ gave detailed explanations for his findings, which are supported by substantial evidence.

### Medical Source Opinion Evidence

Next, plaintiff raises a number of issues regarding the ALJ's treatment of the medical evidence. Plaintiff challenges the ALJ's decision to give little weight to the medical source statement completed by a medical resident at the OU Family Clinic. (Dkt. # 13). Plaintiff argues that the ALJ "engage[d] in pure speculation" in rejecting the opinion and failed to conduct a proper treating physician's analysis of the medical source statement. Id.

As an initial matter, although plaintiff was a patient at OU Family Clinic, there is no evidence that the resident who completed the medical source statement was her treating physician. (R. 839-40). In fact, plaintiff referred to Dr. Paudel, another doctor at OU Family Clinic, as her treating physician. (R. 193-96). While an ALJ must conduct the treating physician analysis when he gives less than controlling weight to a treating physician's opinion, the ALJ's duty to examine other medical opinions is less stringent. See generally Doyal v. Barnhart, 331 F.3d 758, 762-64 (10th Cir. 2003). For opinions that do not qualify as treating physician's opinions, the ALJ need only consider the opinion evidence and give "specific, legitimate reasons for rejecting it," using the same factors used to evaluate a treating physician's opinion. Id. at 764 (citations omitted).

The ALJ fulfilled his obligation with respect to the resident's medical source statement. The ALJ stated that "it appears the physician relied quite heavily" on plaintiff's subjective

complaints in completing the medical source statement. (R. 18). Plaintiff argues that this statement is speculation by the ALJ because the ALJ used the words "it appears" and also stated that the resident "seemed" to accept plaintiff's statements as true. Id. The undersigned disagrees. The medical source statement contains no references at all to any medical records that support the findings that plaintiff is disabled; therefore, it was reasonable to conclude that the resident who completed the form relied on plaintiff's statements. (R. 839-40). Additionally, the ALJ relied on his discussion of the objective medical evidence and plaintiff's lack of credibility in rejecting the resident's opinion. (R. 18). For example, the ALJ found that plaintiff had received little treatment for her back and hip pain and that plaintiff no longer required a prescription for joint inflammation. Id. Plaintiff's back and hip pain did not even qualify as a severe impairment, and plaintiff has not objected to that finding. (R. 13, 18). If, based on the objective medical evidence, plaintiff's back and hip pain had "no more than a minimal effect" on plaintiff's ability to work, then her back and hip issues could not constitute grounds for disability. (R. 18). The ALJ's reasons are specific and supported by substantial evidence in the record. Accordingly, the ALJ did not err in giving "little weight" to the resident's opinion.

**Credibility**

Finally, plaintiff raises a number of objections to the ALJ's credibility analysis. (Dkt. # 13). Plaintiff claims that the ALJ "miscasts the evidence," uses circular reasoning, relies on boilerplate language, and fails to identify which statements he accepted as true. Id.

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be

closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

In this case, the ALJ conducted a lengthy credibility analysis in which he focused on plaintiff's testimony, her daily activity, and the objective medical evidence. For example, plaintiff testified at the hearing that she could only stand for three to five minutes and walk two or three blocks. (R. 17). Plaintiff also testified, however, that she took the bus to work.[3] Id. The testimony about plaintiff's work activities also belied her claim that she could not concentrate for more than a few minutes. Id. The ALJ then discussed the medical evidence at length and noted that the evidence of plaintiff's impairments was "rather mild" in comparison to plaintiff's complaints of continuous and severe pain. (R. 20-21). The ALJ relied on evidence that plaintiff's doctors had discontinued her joint inflammation medication and that plaintiff's diabetes was controlled as long as she was compliant with medication. (R. 21). The ALJ found that plaintiff had voluntarily discontinued treatment for a mood disorder, implying that she no longer needed counseling. Id. Finally, the ALJ relied on plaintiff's work activities and activities of daily living

---

[3] At the hearing after remand, she gave a detailed description of her route to work, which directly conflicted with her testimony that she was limited in her ability to walk and stand. (R. 65-66). Although the ALJ did not discuss that evidence in detail in his decision, the record clearly supports his findings.

as evidence that plaintiff's subjective complaints were not supported by the evidence and were, therefore, not credible. (R. 21-22). The ALJ's credibility analysis does not warrant remand.

## RECOMMENDATION

For the reasons set forth above, the undersigned RECOMMENDS that the Court **AFFIRM** the ALJ's decision.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by September 5, 2013.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 21st day of August, 2013.

_____
T. Lane Wilson
United States Magistrate Judge